IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK PITU,<br><br>            Plaintiff,<br><br>vs.<br><br>ASTORIA QUEENS ENTERPRISES, LLC,<br><br>            Defendant. | Case No. 21-7105<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## **COMPLAINT**

### NATURE OF THE ACTION

1. People with disabilities are entitled to access public accommodations because all people are entitled to the full and equal enjoyment of accommodations, advantages, facilities, or privileges of public establishments.

2. At the very least, they are entitled to assert the need for reasonable accommodation without having to fear assault, battery, and extreme violent conduct from store employees in retaliation.

3. This action arises because, on December 23, 2020, Plaintiff, Patrick Pitu, an individual who is unable to medically tolerate a mask because of his disabilities and has medical documentation of his need for a medical exemption, was not only refused accommodation in accordance with the operative mask mandate and governing state and federal statutes, but physically assaulted and traumatized by Defendant's employees for having asserted his right to accommodation.

4. Mr. Pitu suffered serious and lasting physical, mental and emotional injuries as a result.

5. This is an action to halt and seek redress for the unlawful discrimination and abuse which Astoria Queens Enterprises, LLC (D/B/A DII or DII Deals & Discounts), its employees, and its agents committed against Mr. Pitu because of his disability and request for accommodation.

6. This action arises primarily under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, New York City Human Rights Law, N.Y.C. Administrative Code § 8-101, *et seq.*, and state laws.

## PARTIES

7. Plaintiff Patrick Pitu is an actor who was based in New York City during all times relevant to this Complaint.

8. Mr. Pitu is a disabled individual pursuant to the definition enumerated in 28 C.F.R. § 36.105.

9. Defendant is Astoria Queens Enterprises, LLC D/B/A DII or DII Deals & Discounts (collectively "DII" or "Defendant"), a business entity with multiple store locations across the New York City metropolitan area and having its principal place of business at 626 Sheepshead Bay Road, Suite 320, Brooklyn, New York 11224. Mr. Pitu was assaulted at the Astoria, New York store, located at 3611-17 Broadway, Astoria, New York.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12188.

11. This Court has supplemental jurisdiction over Mr. Pitu's state and local law claims pursuant to 28 U.S.C. § 1367 because those claims arise from a common nucleus of operative facts such that the adjudication of Mr. Pitu's state and local claims with Mr. Pitu's federal claims furthers the interest of judicial economy.

12. Venue in this Court is proper under 28 U.S.C. § 1391. The acts and omissions giving rise to this action occurred in the Eastern District of New York, and Defendant conducts business and maintains a facility in Kings County, New York. Also, "a substantial part of the events or omissions giving rise to the claim occurred" within this jurisdiction. 28 U.S.C. § 3191(b)(2).

## FACTUAL ALLEGATIONS

13. On April 15, 2020, then Governor Andrew M. Cuomo promulgated Executive Order 202.17 (the "Mask Mandate"), which required individuals over the age of two, who are medically able to tolerate a face covering, to wear a mask covering the mouth and nose when in public and when unable to maintain "social distance." COVID-19 Emergency Regulations, N.Y. Comp. Codes R. & Regs. tit. 10, § 66.3.2 (2020) (repealed 2021).

14. On May 28, 2020, Governor Cuomo issued Executive Order 202.38, which empowered business orders to enforce the Mask Mandate with the caveat that "this directive shall be applied in a manner consistent with the Americans with Disabilities Act or any provision of the New York State or New York City Human Rights Law, or any other provision of law."

15. Plaintiff Patrick Pitu cannot medically tolerate a mask because of his disabilities.

16. Mr. Pitu has a letter from a licensed doctor exempting him from the mask requirement. Among other disabling conditions, he suffers from chronic conditions affecting his respiratory system. He has a deviated septum, trouble breathing, and has been told he needs surgery. Wearing a mask causes Mr. Pitu to get cystic acne, migraines, and suffer extreme anxiety and panic attacks because feeling like he cannot breathe triggers his underlying anxiety condition.

17. This shortness of breath and the manner in which masks obstruct and restrict his breathing exacerbates Mr. Pitu's underlying anxiety condition as well.

18. On or around December 23, 2020, Mr. Pitu visited the DII Deals & Discounts store location at 3611 Broadway in Astoria, New York.

19. Upon information and belief, this location is owned by Astoria Queens Enterprises, LLC and insured by Liberty Mutual Insurance on behalf policyholder Bayonne New Jersey Enterprises, LCC.

20. This store is in Mr. Pitu's neighborhood and sells essential home goods at affordable prices.

21. Once inside the store, security guards employed by Defendant asked Mr. Pitu to put a mask on.

22. Mr. Pitu stated that he had a medical exemption and had a right to be accommodated because the mask ordinance grants exemptions for those who cannot "medically tolerate a face-covering." COVID-19 Emergency Regulations, N.Y. Comp. Codes R. & Regs. tit. 10, § 66.3.2 (2020) (repealed 2021).

23. Therefore, Defendant was aware of his status as a person with a qualifying disability entitled to reasonable accommodations under various local, state, and federal laws.

24. Defendant's employees refused to reasonably accommodate Mr. Pitu.

25. Instead, they retaliated. Several employees, acting in the scope of their employment, grabbed him, yanked his hood so hard that it ripped and shoved it over his eyes and face so roughly that the zipper of his coat and hood were choking him. Mr. Pitu could not breathe and his neck was injured by the violence of the actions.

26. Despite outnumbering him, and despite Mr. Pitu not having engaged in any violence precipitating this attack, the security guards continued to threaten more bodily harm and then roughly attacked Mr. Pitu.

27. During this encounter, Mr. Pitu was yelling to them that he could not breathe, that he had a medical exemption, and that they were hurting him, as he begged them to stop.

28. Eventually the employees shoved Mr. Pitu out the side door of the store. He was so traumatized, he collapsed to his knees upon exiting.

29. Mr. Pitu called 911 from the pavement outside.

30. Upon information and belief, Defendant's employees made false reports to the police about the attack when the police came to respond to the 911 call.

31. After speaking with the Defendant's employees inside the store, instead of addressing the security guards' for their violence against Mr. Pitu, they arrested him, claiming that they were going to arrest all parties.

32. Upon information and belief, no employees of DII were arrested.

33. Mr. Pitu was kept overnight and charged with serious criminal offenses, which were all later dropped and sealed.

34. This experience of incarceration and threat of prosecution only aggravated the severity of emotional distress and harm that Mr. Pitu suffered.

35. Further, this experience of incarceration and its effects on a person like Mr. Pitu, who already suffered from anxiety and flashbacks, were reasonably foreseeable subsequent related events arising from Defendant's employees' conduct.

36. Mr. Pitu was handled with no regard for his safety and sustained serious neck injuries from this event. He also suffered serious emotional and psychological damage from the attack, and, upon information and belief, now has post-traumatic stress disorder.

37. These injuries, among others, persist today.

38. Mr. Pitu has suffered long-lasting, and life-altering, physical limitations directly resulting from these discriminatory and violent events.

39. Shortly after the incident, Mr. Pitu went to seek treatment from a chiropractor for the intense pain in his neck from the attack.

40. The provider took x-rays and told Mr. Pitu that he suffered from whiplash, and upon information and belief, a pinched nerve. He told Mr. Pitu that it is likely that Mr. Pitu will have lasting pain for the rest of his life as a result of the incident.

41. Over a year later, Mr. Pitu's pain remains disabling. He is unable to sit or stand for long periods of time, or even lie down comfortably in many positions.

42. This pain is impacting Mr. Pitu's ability to work. He has been an actor for over twenty years, and a member of the Screen Actors Guild ("SAG") for 15 years. His career was progressing, and at the time of the attack, he was beginning to get small roles in major films and television shows.

43. Within two months after he was attacked by Defendant's employees, he had to put his SAG membership on hold, which has marked downstream effects on his employment opportunities, in large part because of the physical limitations resulting from his assault, and his anxiety arising out of the event.

44. Additionally, Mr. Pitu no longer feels safe in stores generally, which impedes so many areas of his life. He is afraid to exercise his medical exemption, which he needs, and he generally suffers from increased anxiety and loss of sleep.

45. Mr. Pitu does not pose a direct threat to the public based on his disability or needed accommodation.

46. The bulk of the science fails to support a conclusion that masks can stop COVID-19 from spreading to others. Peer reviewed and controlled studies show that cloth masks have no significant impact on reduction of the spread of COVID-19.

47. As such, allowing Mr. Pitu to have a mask exemption, in accordance with the Mask Mandate, which provided for and in fact requires such exemptions, would not pose a significant threat of substantial harm to those around him. Mr. Pitu should have been accommodated.

48. Even more importantly, Mr. Pitu should not have been retaliated against, attacked, and permanently injured for peacefully attempting to exercise his right to an exemption.

49. Mr. Pitu would like to safely shop at Defendant's business because he needs to be able to access affordable goods and services provided by this neighborhood store; but he has had intense anxiety about entering stores generally, and Defendant's store specifically, since these events.

50. An order granting injunctive relief prohibiting future discrimination like that suffered by Mr. Pitu would restore his ability to safely enjoy the public accommodations provided by Defendant to the public.

## CLAIMS FOR RELIEF

### *Common Elements to All Claims*

51. The security guards employed by Defendant acted within the scope of their employment for Defendant in barring, removing, and manhandling Plaintiff, and according to the doctrine of *respondeat superior*, Defendant is legally responsible for their misconduct under each claim below.

52. But for the violence of Defendant's employees, and but for their discriminatory disregard for his disabling conditions, and animus towards those conditions, Mr. Pitu would not have been subjected to physical, emotional, and psychological abuse.

53. Defendant was aware that Mr. Pitu had a type of condition that would be aggravated by the violent conduct complained of herein, and yet Defendant's employees, acting in the scope

of their employment as Defendant's representatives, intentionally disregarded the consequences of their actions and the harm caused to Plaintiff.

54. But for the negligent training, hiring and supervision by Defendant, Defendant's employees would have known that this conduct violates many civil rights laws and offends the spirit and letter of equal access to public accommodations.

55. But for the negligent training, hiring and supervision by Defendant, Defendant's employees would not have escalated the situation to one of tortious violence and false imprisonment.

56. It was reasonably foreseeable, particularly in the political climate regarding masks, that Defendant's employees could harm disabled individuals and violate disability laws and the mask mandate's requirement that medical exemptions be honored. Defendant had a duty to ensure his customer's safety by adequately hiring training and supervising employees engaged in security and compliance efforts around the mask mandate.

57. But for Defendant's failures, Plaintiff would not have been harmed.

## COUNT I

## THE AMERICANS WITH DISABILITIES ACT

58. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

59. Defendant violated Plaintiffs rights secured under the Americans with Disabilities Act.

60. Disabled people are guaranteed access to, and full and equal enjoyment of, places of public accommodation, including stores.

61. The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, prohibits anyone who operates a place of public accommodation from discriminating on the basis

of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182.

62. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation cannot deny participation or offer unequal or separate benefits to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. §§ 36.202.

63. Pursuant to the ADA, a place of public accommodation may not retaliate against a disabled person for requesting reasonable accommodation or participating in any action to enforce his rights under the ADA. Retaliation is its own charge under the ADA, independent from the failure to accommodate. Defendant's actions constitute both failure to accommodate and retaliation against Plaintiff.

64. Because Plaintiff's post-traumatic stress disorder and asthma substantially limit at least one of Plaintiff's major life activities and major bodily functions, Plaintiff is an individual with a disability under the ADA. 42 U.S.C. § 12102(1)-(2).

65. Defendant operates its stores that are places of public accommodation as defined under Title III of the ADA. 42 U.S.C. § 12181(7).

66. Defendant's violence towards Plaintiff and forcible removal of Plaintiff from the store based on his disability and Defendant's failure to provide reasonable modifications to their policy requiring masks inside the store violated the ADA.

67. Defendant is vicariously liable for the actions of its employees, who were acting within the scope of their employment when they failed to accommodate and retaliated against Defendant for his disability and need for a mask exemption as required by law.

68. It was reasonably foreseeable that Defendant's employees would need to understand their obligations under the ADA, state and local laws, and under the mask regulation

itself to accommodate people who require a mask exemption without denying them and attacking them physically.

69. For failing to accommodate Mr. Pitu pursuant to the ADA, Defendant is liable for injunctive relief and costs and attorney's fees. Because Defendant also negligently allowed employees to retaliate against Mr. Pitu rather than accommodate him, Defendant is further liable for compensatory, nominal, and punitive damages in addition to attorney's fees and costs.

## COUNT II

## NEW YORK STATE HUMAN RIGHTS LAW

70. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

71. Defendant violated Plaintiffs rights secured under the New York State Human Rights Law.

72. The New York State Human Rights Law ("SHRL"), N.Y. Exec. Law § 290, *et seq.*, is enacted "to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants. " N.Y. Exec. Law § 290(3).

73. Defendant and its employees or agents operate a place of public accommodation and therefore cannot "directly or indirectly. . . refuse, withhold from or deny to such person any of the accommodations, advantages, facilities, or privileges thereof." *See* N.Y. Exec. Law § 296(2)(a).

74. Once inside the store, security guards employed by Defendant and acting within the scope of their employment asked Plaintiff to put a mask on or leave. Plaintiff stated that he had a medical exemption and had a right to be accommodated, as the mask ordinance states those who can't wear a mask for medical reasons are exempt.

75. Defendant's employees refused to accommodate Mr. Pitu's medical exemption, and instead harassed, retaliated against, and harmed Mr. Pitu physically.

76. Defendant is vicariously liable for the actions of its employees, who were acting within the scope of their employment when they failed to accommodate and retaliated against Defendant for his disability and need for a mask exemption as required by law.

77. It was reasonably foreseeable that employees would need to understand their obligations to accommodate and avoid harming disabled individuals entitled to a mask exemption under federal, state, and local law and under the terms of the mask regulation and that failure to train them could result in injuries to Mr. Pitu and others similarly situated.

78. For its violation of SHRL, Defendant is liable for injunctive relief, costs, and damages.

## COUNT III

## NEW YORK CITY HUMAN RIGHTS LAW

79. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

80. Defendant violated Plaintiff's rights secured under the New York City Human Rights Law.

81. The New York City Human Rights Law ("CHRL"), N.Y.C. Administrative Code § 8-101, *et seq.*, prohibits "any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public

accommodation" from refusing, withholding from, or denying a person, because of their disability, "the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." N.Y.C. Administrative Code § 8-107(4)(a)(1)(a).

82. The CHRL was enacted because "there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences...." N.Y.C. Administrative Code § 8-101.

83. Defendant created a setting where Mr. Pitu's needs based on his disability would not be respected or accommodated. Defendant is vicariously liable for the actions of its employees, who acted within the scope of their employment in furtherance of Defendant's business, in failing to accommodate and retaliating against Defendant for his disability.

84. It was reasonably foreseeable that Defendant's employees would need to understand their obligations to accommodate disabled individuals rather than assault and attack them and that failure to train employees properly could result in Mr. Pitu's injuries.

85. Defendant's actions denied Plaintiff the full and equal enjoyment of the store.

86. For its violation of CHRL, Defendant is liable for compensatory and punitive damages, injunctive relief, costs, expert fees, and attorney's fees.

## COUNT IV

## PRIMA FACIE TORT

87. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

88. Defendant committed a prima facie tort against Plaintiff.

89. "[T]he specific cause of action of prima facie tort consist[s] of four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (N.Y. 1984).

90. As stated above, Defendant's employees intentionally inflicted harm against Plaintiff and this resulted in special damages.

91. The special damages herein include medical expenses arising from treating the long-term injuries caused by Defendant.

92. Plaintiff also suffered pecuniary loss of earning capacity as a result of these injuries.

93. Defendant's employees' acts were committed in furtherance of Defendants' business. Defendant is vicariously liable for its agents' actions in the scope of employment.

94. As a business, Defendant, acting through employees and agents, is lawfully able to remove trespassers or people causing a disturbance and this may involve the use of force sometimes.

95. However, the uses of force here were without excuse or justification because of their unlawfully discriminatory origin and the excessive use of force under the circumstances.

96. It was reasonably foreseeable that employees tasked with enforcing a mask mandate and acting as security guards could harm disabled individuals unless properly trained and supervised. Because Defendant failed in its duty to ensure that personnel handling such a sensitive manner were adequately trained and supervised, and because the employees were acting in the scope of their employment as Defendant's agents, Plaintiff was harmed.

97. For the above reasons, Defendant is liable for committing a prima facie tort against Plaintiff.

**COUNT V**

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

98. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

99. Defendant intentionally inflicted emotional distress upon Plaintiff.

100. This tort has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (N.Y. 1993).

101. Plaintiff suffered severe emotional distress, which persists to this day, because of Defendant's acts and omissions.

102. Defendant's employees were clearly put on notice as to Plaintiff's disability and need for a medical exemption from mask-wearing requirements.

103. It was reasonably foreseeable that Defendant's employees would need to understand Defendant's obligation to accommodate rather than retaliate against and harm disabled individuals requiring an exemption under the clear terms of the mask mandate.

104. Defendant failed to properly train and supervise its agents or protect Plaintiff from the physical and emotional harms he faced as a result of Defendant's failures.

105. Defendant is vicariously liable for its employees' actions against Plaintiff, which were undertaken within the scope of their employment in furtherance of the employer's business.

106. Defendant and its employees' actions were outrageous because grabbing a disabled person, and roughly yanking his head back and shoving it under his hood of his coat so that he cannot breathe while he yells that he cannot breathe is well-outside of the bounds of any reasonable conduct on the part of store employees.

107. There is a direct link between Plaintiff's ongoing emotional distress and Defendant's actions because PTSD is widely understood to be a high-anxiety disorder that results from trauma and would be aggravated by subsequent traumatic acts, like here.

108. Moreover, anyone would be traumatized by being attacked in this manner, particularly a disabled person who has trouble breathing and suffers from anxiety.

109. Defendant's actions were extreme, which is supported by Plaintiff's persisting injuries.

110. Additionally, Defendant and its employees were not justified in their actions and therefore are liable for causing intentional infliction of emotional distress.

## COUNT VI

## ASSAULT

111. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

112. "[A]ssault involves putting a person in fear of a battery…." *Rivera v. State*, 34 N.Y.3d 383, 389 (N.Y. 2019) (internal citations omitted).

113. Defendants' agents assaulted Plaintiff without justification by charging at him, grabbing him, and yanking his head down to shove it under his own hood so roughly that he was unable to breathe, resulting in his fear of further harm.

114. Plaintiff was in fear of battery and in fact was then battered.

115. Defendant is vicariously liable as the employees were acting within the scope of their employment and were not properly trained or supervised to understand Defendant's obligations to accommodate rather than assault, batter, and retaliate against disabled individuals requiring an exemption from the mask regulation.

## COUNT VII

**BATTERY**

116. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

117. "Battery is the unjustified touching of another person, without that person's consent, with the intent to cause a bodily contact that a reasonable person would find offensive…." *Rivera v. State*, 34 N.Y.3d 383, 389 (N.Y. 2019) (internal citations omitted).

118. Defendant's employees made physical contact with Plaintiff, without his permission, and this contact resulted in injuries that persist to this day.

119. Defendant's employees' intended to make contact with Plaintiff when they yanked his head and physically injured and manhandled him.

120. A reasonable person would find the physical injuries that Plaintiff suffered beyond offensive.

121. Defendant is vicariously liable for the battery committed by its employees because they were acting within the scope of their employment. Further, the employees were not properly trained or supervised to understand Defendant's obligation to accommodate rather than retaliate against, assault and batter disabled individuals requiring an exemption from the mask regulation.

122. Accordingly, Defendant is liable for committing a battery against Plaintiff.

**COUNT VIII**

**FALSE IMPRISONMENT**

123. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein and further alleges:

124. When Defendant's multiple employees restrained Plaintiff and yanked his hood over his head below his mouth, he was unlawfully imprisoned.

125. "The action for false imprisonment is derived from the ancient common-law action of trespass and protects the personal interest of freedom from restraint of movement. Whenever a person unlawfully obstructs or deprives another of his freedom to choose his own location, that person will be liable for that interference. To establish this cause of action the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State of N.Y.*, 37 N.Y.2d 451, 456-57 (N.Y. 1975) (internal citations omitted).

126. Defendant's employees intentionally confined Plaintiff, unreasonably claiming their actions were justified under Defendant's policies and/or practices regarding New York State's Mask Mandate.

127. Defendant is vicariously liable for this because the employees were acting within the scope of their employment. Further, employees were not properly trained to understand Defendant's obligation to accommodate rather than retaliate against, assault, batter, and falsely imprison disabled individuals requiring an exemption from the mask regulation.

128. Further, Plaintiff's confinement was not otherwise privileged because at the time of his restraint, he was not accused of shoplifting or some other offense that could warrant removal from a public business.

129. Given the violent nature of Defendant's actions, Plaintiff was aware of his confinement and his lack of consent is apparent.

130. As a result, Defendant is liable to Plaintiff for damages as a result of this false imprisonment.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff and against Defendant and award the following relief: injunctive relief, nominal,

compensatory and punitive damages, costs, expert fees, and attorney's fees, and any such further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury for all matters so triable.

DATED this 22nd day of March 2022.

                                                          Gibson Law Firm, PLLC

                                                          /s/ *Sujata S. Gibson*
Sujata S. Gibson,
*Attorney for the Plaintiff*
Gibson Law Firm, PLLC
408 W Martin Luther King, Jr. Street
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law